**Eddie J. HUNTER, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security,[1] Defendant.**

**Civ. A. No. 95–2037–GTV.**

United States District Court,
D. Kansas.

July 18, 1995.

---

**1.** Pursuant to P.L. No. 103–296, the Social Security Independence and Program Improvements Act of 1994, the function of the Secretary of Health and Human Services in Social Security cases was transferred to the Commissioner of Social Security, effective March 31, 1995. Shirley S. Chater, Commissioner of Social Security, has been substituted for Donna E. Shalala, Secretary of Health and Human Services, as the defendant in this action, pursuant to Fed.R.Civ.P. 25(d). Although the court has substituted the Commissioner for the Secretary in the caption, in the text reference will continue to be made to the Secretary because she was the appropriate party at the time of the underlying actions.

Joan H. Deans, J.H. Deans Law Office, Raytown, MO, for Eddie J. Hunter.

Christina L. Morris, Office of U.S. Attorney, Kansas City, KS, for Donna E. Shalala, Shirley S. Chater.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This action is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Secretary of Health and Human Services ("Secretary") denying plaintiff's applications for disability benefits under the Social Security Act (the "Act"). Plaintiff has filed a motion for judgment (Doc. 6), which seeks an order reversing the Secretary's decision, while the defendant has filed a motion for an order affirming the Secretary's decision (Doc. 9).[2] For the reasons set forth below, the decision of the Secretary is affirmed.

### I. Procedural Background

This action involves two applications for benefits. On January 26, 1993, plaintiff filed an application for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. § 1381 et seq. On January 27, 1993, plaintiff filed an application for disability benefits under Title II of the Act, 42 U.S.C. §§ 201 et seq. Both applications were denied initially and on reconsideration.

On May 17, 1994, an administrative hearing at which plaintiff and his counsel were present was held before an administrative law judge ("ALJ"). On May 27, 1994, the ALJ rendered a decision in which he determined that plaintiff was not under a "disability" as defined by the Social Security Act. On November 18, 1994, the Appeals Council denied plaintiff's request for review of the

---

**2.** The Tenth Circuit, in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved of the motion practice followed in this district pursuant to D.Kan.Rule 503. The court is in the process of amending D.Kan.Rule 503 to comply with the ruling in *Olenhouse*. For purposes of the present appeal, the court attaches no legal significance to the titles that appear on these motions and instead will, as it has always done, follow the well-established standard of review for Social Security appeals and will rely only on the evidence found within the administrative record.

ALJ's decision. Thus, the ALJ's decision stands as the final decision of the Secretary.

## II. Facts

Following is a brief summary of the evidence available to the ALJ and the testimony received at the hearing.

Plaintiff was born on April 25, 1946. He alleges that he has been disabled since May 1991 when a cement mixer fell on his right hand at work. Plaintiff had applied for disability benefits once previously, in January 1991. At that time he alleged disability due to lower back pain. The claim was denied and plaintiff did not appeal. He apparently returned to work and worked until May 1991 when he injured his right hand.

The medical evidence of record in this case dates back to 1987 when plaintiff was treated at the University of Kansas Medical Center for abdominal pain, nausea, and vomiting. He reported that he had been drinking for five days. He was hospitalized for four days and discharged with a diagnosis of acute pancreatitis, alcoholic gastritis, alcoholism, essential hypertension, and dehydration. Plaintiff was readmitted a few days later for chronic relapsing pancreatitis and was discharged to Valley Hope Hospital for detoxification.

In March 1988, plaintiff sought treatment at the Bethany Medical Center emergency room for lower back pain and occasional problems with his left knee after he was injured in an accident while driving a street cleaner. X-rays of the lumbar spine revealed minimal spondylosis of the lower thoracic and lower lumbar spine, and x-rays of the left knee revealed no abnormalities. He received additional treatment for back pain at the University of Kansas Medical Center. The treating physician diagnosed lumbar strain and lumbar spondylosis with no evidence of a neurologic lesion. In April 1988, the doctor reported that plaintiff's condition had improved but that he still experienced back pain.

In connection with his first application for disability benefits, plaintiff underwent a consultative examination performed by Larry Handlin, D.O., on March 23, 1991. Plaintiff complained of back pain which radiated down both legs and which was aggravated by coughing, sneezing, prolonged sitting, and prolonged standing. Dr. Handlin diagnosed lumbar arthralgia. He noted that plaintiff experienced pain in the back region with restricted range of motion and paraspinus muscle spasm.

From May to November 1991, plaintiff was treated at the Kansas City Orthopedic Clinic Inc., by L.F. Glaser, M.D., for a work-related injury which occurred on May 9, 1991, when a cement mixer fell on his right hand. He had suffered a laceration on his right middle finger which was cleansed and sutured. At visits during June and July, 1991, Dr. Glaser noted that plaintiff's finger was swollen and stiff, and that plaintiff had slight tenderness in the flexor pulley of the injured finger. Plaintiff received occupational therapy from June to October 1991. In September 1991, Dr. Glaser noted that plaintiff could make a reasonable fist for the first time, even though he did not have sustained grip strength. In October 1991, Dr. Glaser recorded that plaintiff was still experiencing pain in his right middle finger even thought the edema had gone down.

Jann Christian, OTR, an occupational therapist wrote on November 6, 1991, that plaintiff was reporting intensified pain radiating from the middle finger up the arm to the elbow and shoulder when the middle finger is bent in any plane of motion. She wrote that plaintiff also reported pain at rest and appeared to be hypersensitive to touch and temperature. Ms. Christian opined that plaintiff could be exhibiting a reflex sympathetic dystrophy. Dr. Glaser wrote on November 18, 1991, that he concurred in this opinion and stated that additional therapy or treatment would not be very helpful.

In a letter dated January 13, 1992, written in connection with plaintiff's workers compensation claim, Dr. Glaser summarized plaintiff's treatment. He noted that plaintiff had progressive impairment of function with restricted motion, chronic edema, and pain. Dr. Glaser diagnosed healed laceration on the volar aspect of the right middle finger, history of crushing injury to the right hand, and reflex sympathetic dystrophy to the right hand and forearm. He concluded that

plaintiff had a permanent partial disability of the right upper extremity of 40 to 50 percent.

Plaintiff was evaluated in connection with his workers compensation claim by James S. Zarr, M.D., on February 14, 1992. Dr. Zarr noted that range of motion and grip strength were decreased in plaintiff's right hand. Dr. Zarr's impression was persistent right middle finger pain with right upper extremity radiation to the level of the shoulder, possibly secondary to reflex sympathetic dystrophy. He recommended that plaintiff be treated at a pain clinic.

Plaintiff was treated at the Pain Management Center of Baptist Medical Center by Mark Chaplick, M.D., from February to May 1992. During that time plaintiff received a series of stellate ganglion injections which were somewhat effective in relieving the pain on a temporary basis. Dr. Chaplick examined plaintiff on April 28, 1992, and reported that plaintiff had some decreased range of motion of the cervical spine on lateral rotation and some tenderness in the right neck where multiple stellate ganglion injections were made. He also reported that plaintiff was intolerant to prednisone and was taking only Tylenol. Dr. Chaplick concluded that further nerve blocks were unwarranted due to swelling, tightness, and pain in plaintiff's neck. On April 29, 1992, Dr. Chaplick re-examined plaintiff and reported that he continued to complain of right neck, back, and upper shoulder and arm pain. Dr. Chaplick stated that he would refer plaintiff for occupational therapy and re-evaluate him in three to four weeks.

Dr. Zarr examined plaintiff in a follow-up visit on May 8, 1992. He noted that plaintiff's overall condition had not improved with the treatment he received at the pain clinic. Dr. Zarr reported that plaintiff had further neck and headache pain in addition to the right extremity sympathetic dystrophy pains. Dr. Zarr stated that he had no further recommendations regarding conservative treatment. He referred plaintiff to a thoracic surgeon for possible sympathectomy.

The surgeon, Hamner Hannah, III, M.D., evaluated plaintiff on June 2, 1992. He stated that cervical dorsal sympathectomy surgery could be helpful if plaintiff's pain is secondary to reflex sympathetic dystrophy, but the surgery is only effective in about one out of five patients. Dr. Hannah recommended that plaintiff be further evaluated by a neurologist.

Dr. Zarr saw plaintiff a final time on June 29, 1992. He had no further treatment to offer plaintiff. He noted that plaintiff had pain with range of motion and palpitation and tenderness throughout various muscle groups of the right arm including the neck and right shoulder. He evaluated plaintiff as having a 20 percent permanent impairment of the upper right extremity which translated to a 12 percent permanent impairment to the body as a whole. Dr. Zarr renewed plaintiff's prescription for Tylenol # 3 and released him to return to work on June 30, 1992, with the restrictions that plaintiff not lift or carry more than 10 pounds, not perform overhead lifting, and only occasionally engage in upper extremity activities.

James P. Hopkins, M.D., performed a workers compensation evaluation on September 15, 1992. Plaintiff reported that he continued to experienced pain in his hand, arm, neck, and shoulder, that he could not use his right arm at all, that he did not drive, and that his wife dressed him. Dr. Hopkins diagnosed chronic reflex sympathetic dystrophy and opined that further physical therapy would be of no benefit. He advised plaintiff to continue wearing a glove and using hot wax. He found that plaintiff had a 30 percent permanent partial disability of the right upper extremity.

Plaintiff's workers compensation claim was settled with a lump sum payment in February 1993. The gross amount of the settlement was $14,000.00. After deductions for expenses and attorney fees, plaintiff received a net settlement in the amount of $9,999.34.

On March 6, 1993, Henry Kanarek, M.D., performed a consultative examination for the Social Security Administration. Plaintiff reported pain in his lower back and pain in his neck that radiated into his head and right arm. He alleged having constant headaches and difficulty lifting or carrying. Dr. Kanarek noted pain in plaintiff's right shoulder, elbow, wrist, and hand with normal range of

motion. Grip strength was zero pounds on the right and 80 pounds on the left. There was reduced range of motion in the cervical and lumbar spine. Plaintiff was unable to pick up a coin, button a button, or open a door with his right hand. Dr. Kanarek diagnosed lumbocervical arthralgia. X-rays of plaintiff's spine revealed mild narrowing of some disc spaces associated with slight anterior end plate osteophytosis.

Atul T. Patel, M.D., performed a consultative examination for the Social Security Administration on June 10, 1993. Plaintiff complained of right hand pain radiating into his arm and shoulder and the right side of his face. He also complained of back pain and right leg pain and alleged occasional numbness in the right upper and lower extremities. He reported that he took one to two Tylenol #3 tablets per day and a muscle relaxant. He stated that he could sit and stand for 20 minutes before suffering arm and leg pain, and could walk one block before experiencing right leg pain. Plaintiff reported that he was unable to lift anything, had difficulty sleeping because of pain, and was dependent on his wife to help him dress due to the decreased mobility and pain.

Physical examination revealed that plaintiff had limited range of motion in his right shoulder and elbow due to pain, but Dr. Patel indicated he was able to get full flexion and extension at the elbow through pain. There was no evidence of muscle atrophy. Grip strength was tested at 20 pounds on the right and 108 pounds on the left. Pinch strength was five pounds on the right and 21 pounds on the left. Plaintiff had limited range of motion in the lumbar spine. Dr. Patel also found limitation of fine motor coordination in the right hand but not the left. Dr. Patel concluded that plaintiff had limitations in activities that required prolonged sitting, standing, or walking. He had difficulty with lifting, carrying, and handling objects secondary to pain in his right hand. Dr. Patel found plaintiff's condition inconsistent with reflex sympathetic dystrophy because plaintiff had no muscle atrophy or skin changes in his right hand, and also because plaintiff had callouses on his right hand.

Plaintiff, his wife, and a vocational expert appeared and testified at the administrative hearing held on May 17, 1994. Plaintiff testified that he suffered from constant pain on his right side from his arm up to his chest, neck, and head. The pain was aggravated by bending or turning his head. He stated that he experience blurred vision at times in connection with his headaches. Plaintiff also alleged suffering from lower back pain, and stated that he wore a back brace. He reported taking Tylenol #3, which he obtained from his sister, several times per day, and also taking over-the-counter Tylenol for the pain. He stated that he also took Tagamet, which he obtained from his brother-in-law, for ulcers, and over-the-counter antacids when Tagamet was not available. Plaintiff wore an isotoner glove to reduce swelling in the right hand, and he used hot wax therapy on his hand and arm three or four times per day.

Plaintiff testified that he had not been treated by a doctor since June 1992. He stated that he could not afford health insurance, and he also noted that doctors had told him that further treatment would not help him. He testified that the workers compensation settlement he received was used to pay past-due house payments and other bills.

In describing his daily activities, plaintiff testified that he did no household chores, had no hobbies, and was unable to drive. He stated that he spent most of his day in a recliner watching television or applying his hot wax therapy. He stated that his wife shaved him, helped him bathe and get dressed, and cut his food for him. Plaintiff also testified that he would be unable to work full time, even if the work did not require using his right arm, because of severe pain, dizziness, and blurred vision. He stated that the pain also affected his ability to think clearly.

Georgia Hunter, plaintiff's wife, testified that plaintiff could no longer perform many activities. She stated that she assisted him in bathing, shaving, combing his hair, buttoning his shirts, and tying his shoes. She testified that plaintiff took approximately eight Tylenol #3 tablets per day and complained of blurred vision. She noted that

health insurance available through her employer would cost about $312 per month.

Daniel Arland, a vocational expert, testified at the hearing at the ALJ's request. He classified plaintiff's past relevant work as a laborer, trash collector, and highway maintenance worker as unskilled and very heavy exertional level. The ALJ posed a hypothetical question regarding plaintiff's ability to work in which he asked Mr. Arland to assume that plaintiff could lift no more than 10 pounds, could not lift overhead, could only occasionally use his dominant right upper extremity, and could not perform fine finger dexterity tasks with his right hand. Mr. Arland responded that plaintiff would be unable to perform his past relevant work, but that he could perform selected unskilled, sedentary jobs such as surveillance system monitor, information clerk, and telephone solicitor, and unskilled light jobs such as security guard and parking lot attendant. Mr. Arland testified that these jobs existed in significant numbers in both the national and local economies.

In response to questioning from plaintiff's attorney, Mr. Arland testified that if difficulties with concentration due to pain and headaches affected plaintiff's ability to complete a task, it would affect plaintiff's ability to perform any job. Mr. Arland stated that an inability to move his head left to right and up and down would affect plaintiff's ability to work as a security system monitor. He further acknowledged that the jobs he listed require good, consistent vision. He also stated that he had placed people suffering from severe pain problems in jobs, and that these people have often experienced difficulty in performing their jobs.

### III. ALJ's Decision

Among the findings made by the ALJ are the following:

• Plaintiff suffers from the following impairments: lumbar arthralgia; questionable diagnosis of right upper extremity reflex sympathetic dystrophy; history of alcoholism (1984 and 1987); and history of pancreatitis (1987 and 1990).

• The testimony of plaintiff and his wife was not credible.

• Plaintiff's residual functional capacity precludes him from lifting and carrying more than ten pounds maximum; lifting overhead; more than occasional use of his right dominant upper extremity; and performing tasks requiring fine finger dexterity with his right hand.

• Plaintiff is unable to perform his past relevant work as a laborer, highway maintenance worker, or trash collector, and is unable to transfer any acquired work skills to the skilled or semi-skilled work functions of other work.

• There are significant numbers of sedentary unskilled jobs in the local and national economies which plaintiff could perform. Examples of such occupations include surveillance system monitor, information clerk, and telephone solicitor. There are also a number of light unskilled jobs which plaintiff could perform, including, security guard and parking lot attendant.

The ALJ concluded that plaintiff has not been under a "disability," as defined in the Social Security Act, at any time since May 21, 1991.

### IV. Analysis

To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The Secretary has developed a five-step sequential evaluation process for determining disability. *See* 20 C.F.R. §§ 404.1520(a)–(f), 416.920; *Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir.1988). If at any step in the process the Secretary determines that the claimant is disabled or is not disabled, the evaluation ends.

The first four steps are not at issue in this case. The ALJ determined that plaintiff established he was not currently engaged in substantial gainful activity (step 1), that he has a severe impairment (step 2), and even though he is not conclusively disabled by the nature of his impairment (step 3), he cannot return to his past relevant work (step 4).

The ALJ's decision that plaintiff is not disabled was made at the fifth step, at which the fact finder must determine whether the claimant has the residual functional capacity "to perform other work in the national economy in view of his age, education, and work experience." *Bowen v. Yuckert,* 482 U.S. 137, 143, 107 S.Ct. 2287, 2292, 96 L.Ed.2d 119 (1987). The Secretary bears the burden of proof at step five. *Id.* at 146 n. 5, 107 S.Ct. at 2294 n. 5.

The Secretary's determination is binding on this court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler,* 811 F.2d 506, 508 (10th Cir.1987). The court's review is to determine "whether the record as a whole contains substantial evidence to support the Secretary's decision and whether the Secretary applied the proper legal standards." *Castellano v. Secretary of Health and Human Services,* 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

[5] Plaintiff first challenges the ALJ's finding that plaintiff's complaints of disabling pain are not credible. In his decision, the ALJ based his finding on a number of factors:

• the absence of substantial earnings in the years prior to plaintiff's alleged onset of disability, indicating a lack of motivation or financial incentive to work;

• plaintiff's prior attempt to secure disability benefits based on alleged back pain even though plaintiff had received only minimal treatment for the condition;

• plaintiff's failure to obtain any medical treatment since June 1992;

• minimal objective findings to support plaintiff's subjective complaints;

• plaintiff's failure to report some of his alleged symptoms to any physician;

• the implausibility of plaintiff's assertions regarding the amount of Tylenol # 3 that he takes; and

• the absence of any report from a treating physician stating that plaintiff is totally disabled.

The ALJ also found the testimony of plaintiff's wife to be not credible because it is based on plaintiff's incredible allegations, is self-serving, and is inconsistent with the conclusions and observations contained in the medical treatment records.

In analyzing subjective complaints of disabling pain, the ALJ must consider: "(1) whether the claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a 'loose nexus' between the proven impairment and the claimant's subjective allegations of pain; and (3) if so, whether, considering all the evidence, both objective and subjective, claimant's pain is in fact disabling." *Musgrave v. Sullivan,* 966 F.2d 1371, 1375–76 (10th Cir.1992) (citing *Luna v. Bowen,* 834 F.2d 161, 163–64 (10th Cir.1987)).

There appears to be no dispute that plaintiff established the first two prongs of this analysis. The ALJ found that plaintiff suffered from Lumbar arthralgia and a "questionable diagnosis" of right upper extremity reflex sympathetic dystrophy. Both of these conditions bear at least a loose nexus to plaintiff's complaint of pain. Although the ALJ found the diagnosis of reflex sympathetic dystrophy to be questionable, there is significant objective medical evidence in the record which would provide a basis for plaintiff's allegations of at least some pain in his right hand, arm, and shoulder. *See Huston v. Bowen,* 838 F.2d 1125, 1129 (10th Cir.1988) (requiring consideration of all relevant evidence as long as impairment is reasonably expected to produce *some* pain).

The issue, therefore, is whether the ALJ's disbelief of plaintiff's complaints of pain was based on consideration of all the relevant evidence, and if so, whether his conclusion is supported by substantial evidence. The ALJ must consider several factors when evaluating the credibility of complaints of pain. These factors include

"the levels of medication and their effectiveness, the extensiveness of the attempts

(medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence."

*Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir.1991) (quoting *Huston,* 838 F.2d at 1132 and n. 7).

■ In discounting plaintiff's claims of disabling pain, the ALJ noted that plaintiff had not received medical treatment since June 1992, almost two years prior to the hearing. In deciding what weight, if any, to give to plaintiff's failure to pursue further medical treatment, the ALJ should consider "(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Thompson v. Sullivan,* 987 F.2d 1482, 1490 (10th Cir.1993) (quoting *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir.1987)).

In this case, the doctors treating plaintiff in 1992 told him that no further treatment was available to improve his condition. Nevertheless, if plaintiff continued to experience severe pain, it is likely that he would seek treatment if for no other reason than to secure pain medication. Plaintiff testified that he was able to obtain Tylenol # 3 tablets from his sister. The ALJ specifically found this testimony to be not credible based on plaintiff's allegations regarding the quantity of Tylenol # 3 that he allegedly takes. In addition, plaintiff testified that he suffered blurred vision, dizziness, and inability to concentrate due to pain. These symptoms were never reported to any of plaintiff's treating physicians. It is unlikely that plaintiff would have failed to pursue additional medical treatment if he had been experiencing worsening pain and additional symptoms as he alleged in his testimony.

Plaintiff also testified that he had not sought further medical treatment because he could not afford it. The ALJ considered but rejected this explanation on the grounds that plaintiff had never sought free or reduced cost medical treatment and had not sought even minimal treatment for pain relief after receiving a net workers compensation settlement of approximately $10,000. Based on the circumstances of this case, the ALJ properly relied on plaintiff's failure to pursue medical treatment as support for the determination of noncredibility.

■ The ALJ also noted that plaintiff had minimal and sporadic earnings in the years immediately preceding his alleged onset of disability and considered this to be evidence that plaintiff lacked motivation or financial incentive to return to work. The motivation of the claimant is one factor that an ALJ should consider in assessing credibility under the *Hargis* standard cited above. There is no indication that the ALJ failed to consider other evidence in the record relating to the plaintiff's motivation. The consistency of a claimant's work history is probative of credibility because it is a measure of the claimant's willingness and motivation to work.

Finally, the ALJ found that plaintiff's allegations regarding the severity of his pain were not completely consistent with the objective medical evidence. The ALJ noted that plaintiff had never received treatment for his alleged blurred vision, dizziness, and inability to concentrate. In addition, Dr. Patel, after performing a consultative examination on June 10, 1993, concluded that there were no objective findings to suggest a diagnosis of reflex sympathetic dystrophy. Dr. Patel based this on his findings that plaintiff had no muscle atrophy in the right hand, and no skin changes, but that he did have callouses on his right hand. If, as plaintiff alleges, he has been completely unable to use his right hand due to disabling pain, some skin softening would likely have occurred after two years. The ALJ also took into consideration the fact that none of plaintiff's treating physicians had ever concluded that plaintiff is totally disabled. The court finds that the ALJ properly considered the evidence in concluding that plaintiff's subjective complaints are inconsistent with the objective medical evidence.

The court concludes that the ALJ considered all relevant evidence before him in determining that the testimony of plaintiff and his wife regarding the severity of plaintiff's pain, was not credible. In reviewing such a credibility determination, courts should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." *Casias v. Secretary of Health and Human Services,* 933 F.2d 799, 801 (10th Cir.1991). The court finds that the ALJ's conclusion regarding credibility is supported by substantial evidence.

Plaintiff also argues that the ALJ's hypothetical question to the vocational expert was improper because the question failed to include relevant information regarding plaintiff's condition. Specifically, the plaintiff asserts that the ALJ erred in failing to ask the vocational expert to consider plaintiff's daily treatments with hot wax therapy, the effect of taking several Tylenol #3 tablets each day, plaintiff's blurred vision and dizziness, and the difficulty plaintiff alleged in turning his head.

An ALJ's hypothetical questions must include a full description of a claimant's impairments in order for the testimony elicited by such questions to constitute substantial evidence to support the ALJ's decision. *Hargis,* 945 F.2d at 1492. An ALJ's hypothetical questions need not, however, include all the limitations to which a claimant has testified. The ALJ may restrict his questions to those limitations he has found to exist based upon substantial evidence in the record. *See Gay v. Sullivan,* 986 F.2d 1336, 1341 (10th Cir.1993).

The court has already upheld the ALJ's finding that plaintiff's subjective allegations of pain are not credible. A claimed impairment that is found to be not credible or is otherwise not supported by substantial evidence need not be included in a hypothetical. *See Jordan v. Heckler,* 835 F.2d 1314, 1316 (10th Cir.1987) (ALJ's failure to include complaints of pain in hypothetical was not inappropriate as there was not sufficient evidence that pain interfered with the claimant's ability to work.). The ALJ, therefore, did not err in relying on the vocational expert's testimony elicited by a hypothetical question that included only those impairments the ALJ found to be credible.

## V. Conclusion

After careful consideration of the record and the parties' arguments, the court concludes that the record contains substantial evidence to support the ALJ's determination.

IT IS, THEREFORE, BY THE COURT ORDERED that plaintiff's motion for judgment (Doc. 6) reversing the Secretary's decision is denied.

IT IS FURTHER ORDERED that defendant's motion for an order affirming the Secretary's decision (Doc. 9) is granted.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**